## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN FACENDA, JR., Executor of the Estate of : | |
| JOHN FACENDA and JOHN FACENDA, JR. in : | |
| his own right : | |
| 1028 Foster Avenue : | |
| White Haven, PA  18961 : | **CIVIL ACTION NO.: 06-3128** |
| : | |
| **Plaintiff** : | |
| v. : | |
| : | |
| N.F.L. Films, Inc. : | |
| One N.F.L. Plaza : | |
| Mt. Laurel, New Jersey 08054 : | |
| and : | |
| The National Football League : | |
| 280 Park Avenue : | |
| New York, NY  10017 : | |
| and : | |
| N.F.L. Properties, LLC : | |
| 280 Park Avenue : | |
| New York, NY  10017 : | |
| **Defendants** : | |

# O R D E R

AND NOW, this _____day of _____, 2006, upon consideration of the

Defendants Motion for Judgment on the Pleadings and Plaintiff's response thereto, it is hereby

ORDERED and DECREED that said Motion is in all respects DENIED.


BY THE COURT:


_____

MARVIN KATZ, S.J.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN FACENDA, JR., Executor of the Estate of<br> JOHN FACENDA and JOHN FACENDA, JR. in<br>his own right<br>1028 Foster Avenue<br>White Haven, PA  18961** | : <br> : <br> : <br> : <br> : <br> : | <br><br><br><br>**CIVIL ACTION NO.: 06-3128** |
| **Plaintiff** | : | |
| **v.** | : <br> : | |
| **N.F.L. Films, Inc.<br>One N.F.L. Plaza<br>Mt. Laurel, New Jersey 08054<br>          and<br>The National Football League<br>280 Park Avenue<br>New York, NY  10017<br>          and<br>N.F.L. Properties, LLC<br>280 Park Avenue<br>New York, NY  10017** | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | |
| **Defendants** | : | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
## MOTION FOR JUDGMENT ON THE PLEADINGS

For the reasons set forth in the accompanying memorandum of law, Plaintiff respectfully

requests that this Court enter an Order denying Defendants' Motion for Judgment On the

Pleadings.

**THE BEASLEY FIRM, LLC**

By: _____

Paul A. Lauricella, Esquire
Attorney I.D. No.:  45768
1125 Walnut Street
Philadelphia, PA  19107
(215) 592-1000
Attorney for Plaintiff

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     iii,iv

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

     A.      The Legendary John Facenda . . . . . . . . . . . . . . . . . . . . . .     1

     B.      The "Releases" Drafted By NFL And Executed By
             Mr. Facenda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3

         1.      The Ambiguous "Releases" Drafted By NFL
                Are The Sole Basis Upon Which Defendants
                Assert Their "Right" In This Matter . . . . . . . . . .     3

         2.      Defendants Claim Their Rights Derive From
                These Releases . . . . . . . . . . . . . . . . . . . . . . . . . . .     5

             a.      Defendants' Exclusive Reliance
                    Upon The Releases Defeats Their
                    Purported Right To Use
                    Mr. Facenda's Voice . . . . . . . . . . . . . . . . .     5

             b.      Defendants' Impermissibly Used
                    Mr. Facenda's Voice In Violation
                    Of The Express Prohibition Within
                    The Release . . . . . . . . . . . . . . . . . . . . . . . . .     6

     C.      Defendants' Nonsensical Characterizations Of The
             Commercial As A Documentary Underscores A Dearth
             Of Cogent Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

         1.      Defendants Purposefully Omitted Material
                 Facts From Their Motion . . . . . . . . . . . . . . . . . . . . .     8

         2.      Characterizing This Commercial As  A
                 Documentary Is Akin To Characterizing The
                 Lands End Catalogue A Literary Work . . . . . . . . . . .     9

             a.      *Defendants Define The Program*
                    *By What It Does Not Do* . . . . . . . . . . . . . . .     9

         3.      The Commercial Uses Time-Honored Advertising
                 Techniques. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

i

**TABLE OF CONTENTS Cont'd**

**Page**

      *a.*    *Commercial Uses Celebrity Endorsements.* . . .    12

      *b.*    *The Commercial Repeatedly Features The EA Sports Logo* . . . . . . . . . . . . . . . . . . .    13

      *c.*    *The Commercial Displays The Game's Features* . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

      *d.*    *The Commercial Aired To Coincide With The Release Of The Game* . . . . . . . . . . . . . . .    15

II.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

    A.    The Defendants' Commercial Is Not Entitled To The Highest Degree Of First Amendment Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

      1.    Defendants' Lanham Act Challenge Is Predicated Entirely Upon The Unfounded Claim That The Commercial Is Actually A Documentary Entitled To The Highest Degree Of First Amendment Protection . . . . . . . . .    15

      2.    The Defendants Erroneously Define Commercial Speech . . . . . . . . . . . . . . . . . . . . . . . .    17

      3.    Defendants Offer Misleading Characterizations Of The Precedent . . . . . . . . . . . . . . . . . . . . . .    19

    B.    Mr. Facenda's State Law Claims Are Not Preempted . . . . .    22

      1.    Defendants Argue For Preemption Without Conceding That The Recordings of Mr. Facenda's Voice Are Copyrightable . . . . . . . . . . . . . . . . . . . . .    22

    C.    Defendants' Use Of Facenda's Voice Was Not Incidental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

    D.    The Commercial Is Not A "News Presentation" On A Matter Of Public Interest . . . . . . . . . . . . . . . . . . . . . . . . .    28

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

**<u>TABLE OF AUTHORITIES</u>**

<u>**Cases**</u>                                                                                              <u>**Page**</u>

Aligo v. Time Life Books,
23 Media L. Rep. 1315, No. C94-20707JW, 1994 WL 715605
(N.D. Cal. Dec. 19, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

In re Asbestos School Litigation, 115 F.R.D. 22, 55 (E.D. Pa. 1987) . . . . . . . . . . . . .   17,18

Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n.,
805 F.2d 666 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

Benak v. Alliance Capital Mgmt., 435 F.3d 396, 401 n.15 (3d Cir. 2006) . . . . . . . . .   1,2,29

Bolger v. Youngs Drug Products Corp.,
463 U.S. 60, 103 S. Ct. 2875, 2880-81, 77 L.Ed. 2d 469 (1983). . . . . . . . . . . . . . . .   17

Cairns v. Franklin Mint Co.,
24 F. Supp. 2d 1013, 1032-33 (C.D. Cal. 1998),aff'd., 216 F.2d 1082 (9th 1999). . . .   7,16

Central Hudson Gas & Electric Corp. v. Public Service Comm'n,
447 U.S. 557, 100 S.Ct. 2343, 2394 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17,18

Clegg v. Cult Awareness Network, 18 F.3rd 752, 754 (9th Cir. 1994) . . . . . . . . . . . .   1

Del Madera Properties v. Rhodes & Gardner, Inc.,
820 F.2d 973, 976 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

Elvis Presley Enterprises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7,16

Friedman v. Rogers,
440 U.S. 1, 11-12, 99 S. Ct. 887, 895,59 L. Ed. 2d 100 (1979) . . . . . . . . . . . . . . . . .   18

Harper & Row, Publishers, Inc. v. Nation Enterprises,
501 F. Supp. 848, 850 (S.D.N.Y. 1980), aff'd.  723 F.2d 195 (2d Cir. 1983) . . . . . . . .   22-23

Kleiner v. First National Bank of Atlanta,
751 F.2d 1193, 1204 n.22(11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Laws v. Sony Music Entm't, 448 F.3d 1134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24,26

MDT Corp. v. New York Stock Exchange, Inc.,
858 F.Supp. 1028, 1032 (C.D. Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

**TABLE OF AUTHORITIES Cont'd**

**Cases**                                                                                    **Page**

Pooley v. National Hole In One Ass'n,
89 F. Supp. 1108, (D. Az. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

In re Primus,
436 U.S. 412, 438n. 32, 98 S. Ct. 1893, 1908 n.32,56 L. Ed. 2d 417 (1978) . . . . . . . .    17

ProCD, Inc. v. Zeidenberg, 86 F.3[rd] 1447, 1454 (7th Cir. 1996) . . . . . . . . . . . . . . . . .    23

Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . .    19,20

Seale v. Gramercy Pictures, 949 F.Supp. 331 (E.D. Pa. 1997). . . . . . . . . . . . . . . . . . .    16,20,21

Shamsky v. Garan, Inc.,
167 Misc. 2d 149, 156, 632 N.Y.S. 2d 930, 934 (1995) . . . . . . . . . . . . . . . . . . . . . . .    24

Stephano v. News Group Publications, Inc.,
64 N.Y. 2d 174, 225, 485 N.Y.S. 2d 220 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

Toney v. L'Oreal, 406 F.3[rd] 905 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23-24,25,26

Virginia State Bd. of  Pharmacy v. Virginia Citizens Consumer Council, Inc.,
425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

Wendt v. Ratzenberger, 125 F.3d 806, 812 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . .    16

White v. Samsung Electronics America, Inc., 971 F.2d 1395 (9th Cir. 1992) . . . . . . . .    16

**STATUTES**

15 U.S.C.§ 1125(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

17 U.S.C. § 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

42 Pa.C.S § 8316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25, 28

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**I.      Introduction**

This action has been brought to redress Defendants' unlawful use of the voice and

likeness of John Facenda, one of the most respected and iconic broadcasters in television history,

in a television commercial for a video game.  This is not an action to enforce a copyright as there

is no claim that Mr. Facenda has ever applied for or obtained a copyright registration in his vocal

performances.  The right asserted here arises out of Mr. Facenda's common law and statutory

right to control the commercial uses of his voice.

Currently before this Court is Defendants' Motion For Judgment On The Pleadings

pursuant to Federal Rule of Civil Procedure 12(c).  Accordingly, the standard of review requires

this Court to accept as true all allegations of material fact in the Complaint and to construe them

in the light most favorable to Plaintiff.  Clegg v. Cult Awareness Network, 18 F.3rd 752, 754

(9th Cir. 1994).  A Court will not dismiss a Complaint unless it appears beyond doubt that the

Plaintiff can prove no set of facts in support of his claim that would entitle him to relief.[1]  Id.

**A.      The Legendary John Facenda**

John Facenda, one of the most revered broadcasters in television history, created history

in two distinct worlds.  In Philadelphia, he was a beloved television anchorman who reported the

---

[1] Defendants attempt to circumvent this standard of review by improperly making repeated reference to purported "facts" contained in newspaper articles.  In Benak v. Alliance Capital Mgmt., 435 F.3d 396, 401 n.15 (3d Cir. 2006), the third circuit held that a court may take judicial notice of newspaper articles for "the fact of their publication" (i.e., "to indicate what was in the public realm"), but "not whether the contents of those articles were in fact true."  Defendants do not merely introduce the articles to show that they were published, but impermissibly use them to make factual assertions such as the amount of money

1

news for over forty years[2] (he was, and forever will be known as "the Voice of Philadelphia").[3] Mr. Facenda's national reputation developed as a result of his groundbreaking role with NFL Films.  In the mid-1960's, Mr. Facenda began narrating the Defendant's game-footage and highlight reels utilizing his distinctively rich, baritone voice and dramatic cadence to describe slow motion highlights of the week's National Football League games (set to a similarly distinctive and dramatic musical score)[4].  Mr. Facenda provided dramatic performances which, to this day, are recognized for their unique sound, melodious delivery, and dramatic inflection[5] (his distinctively dramatic performances were so compelling that he is known to football fans throughout the nation as "the Voice of God" and "the Voice of Doom"[6]).  The significance of Mr. Facenda's contribution to the success of N.F.L. Films and his contribution to the National Football League itself cannot be over-stated.  ***The N.F.L. Films' web-site*** identifies Mr. Facenda as one of its "***founding fathers***", and acknowledges that his "***legendary voice***" is "***synonymous*** with N.F.L. Films."[7]  Mr. Facenda's contribution to the game was so significant that he was inducted into the National Football League's Hall of Fame[8].

Defendants' Motion graciously identifies Mr. Facenda simply as "a retired Philadelphia-area newscaster" who was "one of the narrators" for N.F.L. Films.[9]

---

the Madden Games have grossed and the popularity of the Madden games.  Id. The cases cited by the defense in support of their liberal use of news publications invariably pre-date Benak.
[2] Complaint at paragraph 20.
[3] Complaint at paragraph 21
[4] Complaint at paragraph 23.
[5] Complaint at paragraph 23.
[6] Complaint at paragraph 28.
[7] Complaint at paragraphs 23, 24, 25.
[8] Complaint at paragraph 29.
[9] Defendants' brief at page 4

**B.    The "Releases" Drafted By NFL Films And Executed By Mr. Facenda**

        **1.    The Ambiguous "Releases" Drafted By NFL Are The Sole Basis Upon Which Defendants Assert Their "Right" In This Matter**

It is undisputed that for most of the time that he lent his legendary voice to NFL Films, Mr. Facenda was *an independent contractor* who worked without a written contract.[10] It was not until approximately 1980 that NFL Films sought to obtain written "releases" regarding his work,[11] These ambiguously worded "releases" (which had been drafted by NFL Films) were initially limited to specific performances;[12] however, in 1984, Mr. Facenda executed an identically worded "release" that addressed his continued services .  ***The defense concedes — and, indeed, affirmatively avers — that these nebulous releases are <u>the exclusive basis</u> for their purported right to have used Mr. Facenda's voice in the Madden commercial.***  See discussion, *infra*..[13]  This final "release" (which contained language identical to the prior "releases") appears below.

---

[10] Complaint at paragraph 30; Defendants' Answer at paragraph 30.

[11] Complaint at paragraph 31.

[12] <u>See</u>, exhibits "A"-"C" appended to Plaintiff's Complaint.

[13] Defendants argue that Plaintiff's Complaint did not allege that the commercial in question constituted a violation of the terms of the "release".  This is pure nonsense; the Releases are prominently affixed as exhibits to the Complaint; the Complaint makes repeated reference to the prohibition against commercial uses of Facenda's voice and to the fact that the defendants violated the terms of their release. Among its allegations, the Complaint unequivocally avers that "the agreements between Facenda and N.F.L. Films, Inc. did not confer upon the defendants any right to utilize Mr. Facenda's voice and likeness for this purpose."  Complaint at paragraph 57.  The Complaint further alleges that "even under the express terms of the "releases" it had drafted, N.F.L. Films, Inc. …did not retain any right to use or license Mr. Facenda's voice where such use "constitute(d) an endorsement of any product or service."  Complaint at paragraph 35.  Given the pleading requirements enunciated in the Federal Rules of Civil Procedure, it cannot be said that Plaintiff has not sufficiently apprized the defendants of the fact that the use of Mr. Facenda's voice was beyond the scope of the grant extended by Mr. Facenda to NFL Films.

<u>STANDARD RELEASE</u>

To Whom It May Concern:

In consideration of the fee of $_____, I hereby grant to NFL Films, Inc., the unequivocal rights to use the audio and visual film sequences recorded of me, or any part of them, on a worldwide basis, in perpetuity and by whatever media or manner NFL Films, Inc. sees fit, provided, however, such use does not constitute an endorsement of any product or service.

In addition, I further grant to NFL Films, Inc. the right to use my name, likeness, voice and biographical in-formation in connection with the use of such audio and visual sequences, including, but not limited to, promotion in printed media.

I fully understand and agree to the rights herein granted.

According to the terms of the above "release", Mr. Facenda "<u>granted</u>" the defendant some sort of license to use *unspecified* "audio and visual film sequences" of *unspecified* performances,[14] provided that such use did not, in some *unspecified* fashion, "constitute an endorsement of a product or service."[15]  While the plain language of this "release" is *prospective*, it is at best ambiguous as to whether the "audio and visual film sequences" it references are those which *pre*-date or *post*-date its execution.

The prohibition against uses that "constitute an endorsement of a product or service" is itself ambiguous.  It is not limited to uses which would constitute "***my***" endorsement" or "an endorsement ***by me***"; instead, the prohibition extends broadly to "***an***" endorsement, proscribing uses that constitute "***an***" endorsement of a product or service, whether by Mr. Facenda or

---

[14] Complaint at paragraphs 31-33.  See also Complaint exhibits "A"-"C".
[15] See exhibits appended to Plaintiff's Complaint.

4

anyone else.[16] This conclusion is compelled by the plain language of the document which must be construed against its drafter (i.e., NFL Films).  Simply put, the releases upon which NFL Films claims to have derived its rights prohibited the Defendant from using Mr. Facenda's voice in commercials, or in any other way that "constitute[d] an endorsement of a product or service."

Defendants' Motion, on the other hand, embellishes the phrase and offers the following unwarranted, unduly restrictive, and self-serving interpretation of the nine words in the "release": "*NFL Films (could) not edit those specific recordings to make it appear that Mr. Facenda was telling the public that he endorsed products or services*".[17]

This self-serving and unwarranted construction of the release represents but one of many instances in which the defense mis-states either the law or the facts.[18] Indeed, its characterization of the releases as "broad" and "unequivocal"[19] is both hyperbolic and unsubstantiated. Defendants' tortured interpretation of the "release", however, is merely the precursor to the their most absurd argument: i.e., that the commercial was actually a *"documentary"*.

## 2.   <u>Defendants Claim Their Rights Derive From These Releases</u>

### a.   **Defendants' Exclusive Reliance Upon The Releases Defeats Their Purported Right To Use Mr. Facenda's Voice**

If, prior to 1980, NFL Films had been possessed of the rights to Mr. Facenda's recorded voice, there would have been no need for him to execute a "release" which "granted" Defendants permission to use it.  <u>The defense concedes that the release is the exclusive basis for their</u>

---

[16] Inasmuch as virtually all of Mr. Facenda's recorded performances concerned football contests, the release's prohibitions could not have been intended to be limited to uses of recordings in which Mr. Facenda explicitly identified a product and expressly "endorsed" it; rather, the release prohibited the use of Mr. Facenda's voice in any context which endorsed a product or a service.

[17] Defendants' Brief at page 5.

[18] See discussion, infra.

purported right to have used Mr. Facenda's voice in the Madden commercial.  The Defendants' motion contains the following passages:

- "That right exists as a result of a broad written grant to NFL Films from Mr. Facenda..."[20]

- "In 2005, pursuant to those releases, NFL Films produced the Program"[21]

Defendants base their asserted "right" solely upon these releases.  Taking them at their word, the Court must scrutinize the language contained in the inartfully drafted instruments that are the sole basis asserted for this purported "right".  Thus, for purposes of this motion, if the releases are construed in accordance with their plain meaning so as to apply only to performances that *post-date* their execution, Defendants, by their own admission, would have had *no right whatsoever* to have exploited any of Mr. Facenda's performances which *pre-date* the agreement.  If, on the other hand, the releases are construed so as to encompass those earlier performances, Defendants' purported right to use Mr. Facenda's voice would be limited by the express prohibition against uses which constitute an endorsement.[22]

> b. **Defendants' Impermissibly Used Mr. Facenda's Voice In Violation Of The Express Prohibition Within The Release**

Against this background, Defendants digitally altered the legendary voice of Mr. Facenda and prominently employed it in the introduction to a half hour commercial for a video game called Madden NFL 06.  Notably appearing *within the first two minutes* as part the opening montage, and set against thunderous music, Mr. Facenda's voice, digitally altered so as to sound

---

[19] Defendants' Brief at page 5.
[20] Defendants' Brief at page 1 (emphasis added)
[21] Defendants' Brief at page  5.(emphasis added)
[22] The denial of defendants' Motion would be compelled simply by a finding that the releases upon which they base their "right" do not apply to performances which pre-date their execution.  For purposes of this

like a robot, can be heard reciting the type of powerfully dramatic phrases for which he is so widely known (e.g., "The sport is more than spectacle. It is a game for all seasons," and "X's and O's on the blackboard are translated to imagination on the filed")[23].  The importance of Mr. Facenda's iconic, historic and readily recognizable voice in that opening sequence cannot be overstated[24].  *In fact, the defense admits* that Facenda's voice "augment(ed) the connection between the authenticity of the Madden NFL 06 videogame and NFL football", and that "authenticity" was one of "the <u>central themes</u> of the entire program".  Defendants' brief at 13.

Thus, the Defendants prominently used Mr. Facenda's voice so as to maximize the authenticity of the product and augment <u>the central theme</u> of their infomercial.  This use constituted "an" endorsement of a product, as well as a direct endorsement by Mr. Facenda.[25]

In an attempt to justify their manifestly improper use of Mr. Facenda's voice and likeness in a commercial, Defendants have filed a Motion For Judgment On The Pleadings which can most politely be described as illogical, contradictory and replete with assertions that range from

---

portion of the instant discussion, however, plaintiff will assume arguendo that this threshold failing in defendants' Motion does not exist.

[23] Although Mr. Facenda never explicitly says "Buy Madden 2006", the "release" cannot be construed so as to require such a specific endorsement.  First of all, the product did not exist when Mr. Facenda was alive.  Secondly, none of the recordings maintained by NFL Films would be expected to contain anything approximating such a specific endorsement.  On the other hand, a viewer watching the commercial could certainly be misled into believing that Mr. Facenda's estate or representatives had approved the use and endorsed the product.  Where the celebrity is deceased, the likelihood of confusion may be as to the sponsorship or approval of a product by the celebrity's estate or assignee.  <u>See</u>, <u>e.g.</u>, <u>Elvis Presley Enterprises</u> (assignee of state and federal registered trademarks and publicity rights of deceased celebrity Elvis Presley entitled to relief under Lanham Act); <u>Cairns v. Franklin Mint Co.</u>, 24 F. Supp.2d 1013, 1032-33 (C.D. Cal. 1998), <u>aff'd.</u>, 216 F.2d 1082 (9th 1999)("Congress selected language broad enough to encompass a claim by a deceased celebrity's Estate or by any celebrity's assignee")

[24] The Defendants' motion attempts to minimize the significance of Mr. Facenda's contribution, measuring it by the number of words spoken.

[25] Complaint at paragraph 58.  For purposes of this motion, the Court must accept as true the factual averment that viewers could reasonably believe that Mr. Facenda or his representatives would not have lent his voice to the project if he did not approve of it.

hyperbolic excess to outright mis-statements of fact and law.  Indeed, Defendants' Motion provides the Court with a Twilight Zone of jurisprudence in which one of the most respected broadcasters in the history of television- "the Voice of God", no less- becomes nothing more than a generic "retired Philadelphia area newscaster", the NFL Network somehow becomes the equivalent of The Learning Channel, and a blatant commercial for a video game somehow becomes a "documentary" worthy of Edward R. Murrow and entitled to the highest degree of First Amendment protection.

### C.   Defendants' Nonsensical Characterization of the Commercial As A Documentary Underscores A Dearth of Cogent Defenses

#### 1.   Defendants Purposefully Omitted Material Facts From Their Motion

Defendants' Motion is most remarkable (and most disturbing) for what it does not say. Defendants repeatedly characterize themselves as disinterested documentary film makers who produced the "documentary" simply because it was supposedly a matter of great interest to the public[26].  Without revealing so much as hint of irony, Defendants liken their commercial to cinematic and musical works.[27]  But in their misguided zeal to exaggerate the geopolitical significance of the Madden video game, and their transparent attempt to portray themselves as independent actors, the defendants purposefully failed to inform the Court that this "documentary" concerned a product **in which the defendants have an enormous financial stake.**  In fact, the Defendants' stand to earn as much as **three hundred million ($300,000,000.00) to one billion ($1,000,000,000.00) dollars** in royalties on account of their

---

[26] This statement represents one of the saddest things anybody could say about the American people.
[27] Defendants' Brief at page  10, 11.

lucrative and apparently top secret arrangement and corporate partnership with E.A. Sports[28].
**Unmentioned in Defendants' otherwise thorough** brief (and unmentioned in the commercial itself) is the rather inconvenient fact that the **Defendants earn royalties on every copy of Madden that is sold[29].**  Given Defendants' monumental pecuniary interest in the sales of the game**,** there was more than just a hint of irony in their Motion's' declaration that "***NFL Films had good reason to document* how the Program** (sic) *was created*[30]"; indeed, there were at least **300 million** good reasons, and possibly as many as **one billion** good reasons, none of which were brought to this Court's attention.  While the N.F.L.'s billion dollar deal with E.A. Sports is apparently "top secret"[31], this material fact should not have been kept secret from the Court. Given Defendants' extraordinary, but secret financial interest in the success of the game, their Motion's efforts to convince this Court that their infomercial was akin to an Edward R. Murrow news report suggests that either (1) this team of eminently experienced attorneys somehow forgot about the hundreds of millions of dollars the N.F.L. stands to make, or (2) Defense counsel purposefully withheld material information from the court in violation of their duty of candor towards the tribunal.

      **2.**     **Characterizing This Commercial As A Documentary Is Akin
To Characterizing The Lands End Catalogue A Literary Work**

        *a.*     *Defendants Define The Program By What It Does Not Do*

Defendants are desperate to avoid the characterization of the program as a commercial or

---

[28] Complaint at paragraphs 38-43.  Significantly, defendants did not deny the agreement; they refused however to confirm or deny its financial terms.
[29] See Complaint at paragraph 42.
[30] Defendants' Brief at page 11.
[31] In their Answer to the Complaint, the defendants did not admit or deny the allegation that the royalties that would be earned by the N.F.L. and its Players' Association would likely amount to 300 million to one

infomercial, as their legal arguments are dependent upon the program being characterized as an artistic work entitled to the "highest degree of First Amendment protection".  Defendants' Motion tries futilely to identify aspects of the program that are supposedly inconsistent with Plaintiff's observation that it is, in fact, a commercial.  The results of their efforts are embarrassingly underwhelming and are limited to identification of three or four pieces of information that the commercial *does not* provide.

They argue that "it does not identify the price of the game",[32] as if price is always mentioned in an advertisement.  They protest further, and claim that the "program" does not "tell consumers where the game may be purchased", but there is no evidence that such information is customarily included in such advertisements. They exclaim that "***it doesn't provide any information about the video game systems on which it may be played***". Id.  Yet, even if the provision of such information is the sine qua non of commercial speech (which it is not), defendants are once again playing fast and loose with the facts; they do not inform the court as to whether there are any systems on which the Madden game *could not* be played.[33]

Finally, Defendants argue that the <u>commercial did not "inform consumers...when (the game) goes on sale"</u>[34].  It is in this respect that Defendants' motion makes the leap from material omissions to affirmative false declarations.  The commercial does, indeed, inform viewers as to when the game goes on sale! First of all, it opens with the announcer proclaiming that "<u>the month of August</u> is a time to rejoice....<u>It's...time to launch a brand new Madden football game</u>."

---

billion dollars; defendants simply claimed that the terms of their agreement with EA Sports were confidential.
[32] Defendants' brief at page 10.
[33] Plaintiff respectfully urges this Court to make inquiry of the Defendants as to whether the game could, indeed, be played on literally every gaming system including Playstation2, Playstation Portable, X-Box, X-Box 360, Nintendo Game Cube, Nintendo DS, GameBoy Advance, and Windows XP.

While admittedly, this announcement does not give the exact date and minute, it's enough to inform the average fourteen year old that the game will be in stores before September.

Additionally, though it is not referenced in the "script" that Defendants appended to their Motion, at approximately 22 minutes and 12 seconds into the program, there is a "count-down" informing the viewer that there are only "x" number of days until the release of the game (confirming that the true purpose of the infomercial was to build consumer awareness of the product and of the date it would be available in stores).[35] Images from the video supplied by defense counsel (but not referenced anywhere in the script that was provided- and not mentioned anywhere in Defendants' Brief) depict the countdown.



Thus, the Defendants' arguments regarding the commercial's status as a documentary are based upon irrelevant considerations, material omissions, and blatant falsehoods.

---

[34] Defendants' Brief at 10.
[35] Curiously, this count-down is not referenced in the script that defendants appended to their motion.

3.    **The Commercial Uses Time-Honored Advertising Techniques**

a.    *The Commercial Uses Celebrity Endorsements*

More telling are the aspects of the purported "documentary" that firmly establish its commercial credentials (none of which, again, are referenced anywhere in defendants' brief). The Defendants failed to mention the "documentary's intense use of one of the most time-honored of all advertising ploys: the celebrity endorsement.  In the first two minutes of the commercial, Baltimore Raven Ray Lewis proclaims that "**My favorite game is Madden**," and (former) Minnesota Viking Quarterback Dante Culpepper professes his unusual love for the game ("**I love Madden**").  Later, N.Y. Giant Michael Strahan exclaims "**Everything is so realistic that you look at it and go 'Whoa, these guys have really gotten it right**."

The commercial also features appearances by Eagles quarterback Donovan NcNabb, Pittsburgh Steeler James Farrior, numerous other NFL players, and John Madden, who tells viewers "This is what football is all about…If you want to make it to January, you better (sic) start here."  Alternative Rock stars "Fall Out Boy", "Yellowcard" and "GreenDay" attest to the game's cutting-edge musical soundtrack.  This purported "documentary" manages to include the following platitudes:

- "The Madden franchise ...is mind-boggling";

- "Madden has become the king of all videogames"

- "Madden is the greatest football game franchise ever".

- "It's mind-blowing how realistic it is...It's just mind-blowing"

- "It's really blowing me away in terms of how realistic it is..."[36]

---

[36] See script provided by Defendants.

12

    b.    *The Commercial Repeatedly Features The EA Sports Logo*

The commercial also repeatedly references the EA Sports' slogan ("EA Sports- It's In the game") audibly[37] and visually.   In fact, the EA Sports logo and the EA Sports slogan appear multiple times throughout the infomercial.  Some examples follow:



    c.    *The Commercial Displays The Game's Features*

The commercial devotes considerable time describing another important selling point: the game's extraordinarily detailed graphics and features.   The commercial shows game screens which are sufficient to inform any viewer, especially viewers who are game enthusiasts, about the game's play-calling options, music selection options and other features.  A few examples appear below.

---

[37] See script, provided with Defendants' Motion at page 2 (the transcript mistakenly refers to it as "EA Sports To The Game").









Essentially, the thirty minute program is a forum for the Defendants to show viewers the game's cutting edge (at least as of 2005) graphics. The game's designers appear throughout the program touting their meticulous attention to detail (one of the game's selling points). In connection with these sequences, viewers are shown clips from the game juxtaposed against real football sequences so as to convey the primary selling point of the game: its authenticity and its arresting visual graphics.




> ### d.   The Commercial Aired To Coincide With
> ### The Release Of the Game

Curiously, the Defendants failed to mention when and how often this alleged "documentary" was broadcast.  According to their Answer, Defendants saturated the NFL Network, broadcasting the commercial approximately once every nine hours (i.e., eight times over the three day period leading up to the release of the game).[38]   The timing of the commercial proves, beyond question that its purpose was to fulfill a primary goal of any advertising campaign: develop public awareness of the game's impending release. [39]

Thus, the "documentary" concerned a product in which the Defendants had a monumental financial interest, employed celebrity endorsements, platitudes and sloganeering, informed the viewer as to when the game would be released, and was "coincidentally" broadcast eight times during the three days prior to the game's release.  If this commercial is a documentary, the producers of the Total Gym infomercial should be in line for a Pulitzer Prize.

## II.   ARGUMENT

### A.   The Defendants' Commercial Is Not Entitled To The Highest Degree Of First Amendment Protection

#### 1.   Defendants' Lanham Act Challenge Is Predicated Entirely Upon The Unfounded Claim That The Commercial Is Actually A Documentary Entitled To The Highest Degree Of First Amendment Protection

Count One of Plaintiff's Complaint alleges that Defendants' use of Mr. Facenda's voice violated the Lanham Act.  The Lanham Act, 15 USCS § 1125(a)(1), prohibits the use of a person's name or likeness where such use carries a 'likelihood of consumer confusion as to the

---

[38] See Defendants' Answer.
[39] Although not determinative of the program's status as a commercial, it is noteworthy that it concludes without any credits.  Motion pictures and television programs invariably conclude with credits; commercials do not.

15

affiliation with or endorsement of a product".  It has been applied to cases in which the person whose name or likeness has been appropriated does not expressly endorse the product, but appears to have simply by being associated with it.  See, <u>Seale v. Gramercy Pictures</u>, 949 F. Supp. 331 (E.D. Pa. 1997).  The Act's 'likelihood of confusion' standard is predominantly factual in nature." <u>Wendt v. Ratzenberger</u>, 125 F.3d 806, 812 (9th Cir. 1997) (issue in damages action for Lanham Act violation is "the **likelihood** of consumer confusion"); <u>White v. Samsung Electronics America, Inc.</u>, 971 F.2d 1395 (9th Cir. 1992) (issue is "whether a **likelihood** of confusion exists").  The Complaint alleges that the prominent use of John Facenda's voice would create a likelihood of confusion as to the sponsorship or approval of Defendants' product by his estate or assignee;[40]  given the standard of review applicable to a Rule 12(c) motion, judgment for the defense on this factual issue at this stage in the proceedings is inappropriate.  <u>Id</u>. <u>MDT Corp. v. New York Stock Exchange, Inc.</u>, 858 F.Supp. 1028, 1032 (C.D. Cal. 1994) (summary judgment disfavored where ultimate issue is likelihood of confusion and issue is so inherently factual).

Based upon their tortured characterization of the commercial, the Defendants argue that Plaintiff's Lanham Act Claim fails because a thirty minute sales-pitch for a videogame is somehow entitled to the full protection of the First Amendment.  Defendants' argument is predicated upon a disingenuous characterization of the commercial and a series of citations to cases that have no applicability to these facts.

---

[40] Where the celebrity is deceased, the likelihood of confusion may be as to the sponsorship or approval of a product by the celebrity's estate or assignee.  <u>See</u>, <u>e.g.</u>, <u>Elvis Presley Enterprises</u> (assignee of state and federal registered trademarks and publicity rights of deceased celebrity Elvis Presley entitled to relief under Lanham Act); <u>Cairns v. Franklin Mint Co.</u>, 24 F. Supp.2d 1013, 1032-33 (C.D. Cal. 1998), <u>aff'd.</u>, 216 F.2d 1082 (9th 1999)("Congress selected language broad enough to encompass a claim by a deceased celebrity's Estate or by any celebrity's assignee")

2.    **The Defendants Erroneously Define Commercial Speech**

The Defendants, desperate to avoid the "commercial" label, begin their misleading "analysis" with a tortured definition of commercial speech.  They cite to Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc. 425 U.S. 748 (1976), a case which held that communication by pharmacists of the price of prescription drugs was clearly commercial speech because it did "no more than propose a commercial transaction." 425 U.S. at 761, 762.[41] Defendants turn the case on its head and declare that that commercial speech is *defined* as speech that does "no more than propose a commercial transaction".  While it is true that speech is "commercial" if it does no more than propose a commercial transaction, it does not follow that this is the sole criteria for determining whether speech is commercial.  In fact, Courts have employed various definitions for "commercial speech", none of which come close to the unduly restrictive definition promoted by the defense.

"Commercial speech consists of expression related largely or solely to the economic interest of the speaker. In re Asbestos School Litigation, 115 F.R.D. 22, 25 (E.D. Pa. 1987)(emphasis added).  "Commercial speech consists of expression related largely or solely to the economic interests of the speaker and the audience.  Commercial speech encompasses not merely direct invitations to trade, but also communications designed to advance business interests, exclusive of beliefs and ideas". Kleiner v. First National Bank of Atlanta, 751 F.2d 1193, 1204 n.22 (11th Cir. 1985) citing, inter alia, Central Hudson Gas & Electric Corp. v Public Service Comm'n, 447 U.S. 557, 100 S.Ct. 2343, 2394 (1980); In re Primus, 436 U.S. 412, 438 n. 32, 98 S. Ct. 1893, 1908 n. 32, 56 L. Ed. 2d 417 (1978); Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 103 S. Ct. 2875, 2880-81, 77 L. Ed. 2d 469 (1983) (manufacturer's informational

pamphlets discussing the advisability of prophylactics constitute commercial speech); Friedman v. Rogers, 440 U.S. 1, 11-12, 99 S. Ct. 887, 895, 59 L. Ed. 2d 100 (1979) (trade name constitutes commercial speech).

Defendants have fashioned their entire argument upon an incorrect and unduly restrictive definition of commercial speech, attempting to limit it only to speech which does nothing more than expressly promote a commercial transaction.   They argue that The Making Of Madden NFL 06 "contains no proposal of any commercial transaction,"[42] as if that was the sole criteria for determining whether their infomercial constitutes "commercial speech".  It is in this regard that the Defendants' failure to mention their staggering economic interest in the game is so appalling. The definition of commercial speech is intertwined with the notion of "economic interest;"[43] by failing to disclose their $300 million to one billion dollar interest and by narrowly defining commercial speech without reference to "economic interest," Defendants obviously hoped to portray themselves as disinterested documentary makers, providing a Madden-crazed public with much needed information about the Madden 2006, its soundtrack and visual graphics.  Quite simply, the commercial at issue constitutes "expression related largely... to the economic interest" of the Defendants (presumably the NFL was economically interested in the 300 million to one billion dollars it stands to earn) and hence, is commercial speech.[44]

Moreover, commercial speech is not protected where it is misleading.   Central Hudson Gas & Electric Corp. v Public Service Comm'n,, supra, 447 U.S. at 563, 100 S. Ct. at 2350. Where, as here, the commercial includes defendants' unauthorized use of Mr. Facenda's

---

[41] According to the Court, the proposed transaction communicated by the pharmacist "is simply this: 'I will sell you the X prescription drug at the Y price'". Id.
[42] Defendants' Brief at 10.
[43] In re Asbestos School Litigation, supra, 115 F.R.D. at 25

legendary voice, there is likely to be confusion as to whether Mr. Facenda or his assigns have authorized the use of his voice or otherwise endorsed the game. Thus, Defendants' "use" of Mr. Facenda's voice is not only without First Amendment protection, but is also subject to the sanctions identified in the Lanham Act. 15 USCS § 1125(a)(1)[45].

### 3.    Defendants Offer Misleading Characterizations of Precedent

Defendants similarly expend considerable effort mangling and distorting the holding in Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989). In Rogers, the court was confronted with the limited issue of whether a **misleading title** to an artistic, First Amendment protected movie can give rise to a Lanham Act claim. The Court devised a two pronged test:

> In the context of allegedly **misleading titles** using a celebrity's name, that balance (between the public interest in avoiding consumer confusion, and the public interest in free expression) normally will not support application of the (Lanham) Act unless (1) the title has no artistic relevance to the underlying work whatsoever, or, (2) if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.

875 F.2d at 999 (emphasis added). The two step analysis articulated in Rogers applies *only to titles of protected works.* Id. at 1005, (Griese, J., concurring) ("The only issue dealt with in the majority opinion is that relating to the title") (emphasis added). Accordingly, Rogers is

---

[44] To the extent that the commercial was dressed up to look like it was part of the NFL Network's programming, it remains "an advertisement in disguise" subject to the limited rights accorded commercial speech. Stephano v. News Group Publications, Inc., 64 N.Y.2d 174, 225 , 485 N.Y.S.2d 220 (1984).

[45] The Lanham Act's prohibitions extend to

> Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, ..., or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 USCS § 1125(a)(1).

inapposite on two levels: first, it applies to protected artistic works, such as feature films or musical compositions- not infomercials for video games.  Secondly, it is limited to the analysis of <u>titles</u> that are used in connection with those artistic works.

In an attempt to circumvent and confuse the case's limited holding, including the two step test for determining whether ***a title*** to an artistic work is entitled to protection, Defendants' motion engages in a bit of semantic legerdemain, quietly substituting the term "use" for the word "title".  Defendants' brief at 11-13.  Thus, Defendants expend three valuable pages addressing whether the "use" of Mr. Facenda's voice had any artistic relevance to the commercial or whether the "use" of Facenda's voice was misleading with respect to the commercial's content.   Neither of these considerations has any applicability to <u>Rogers</u> or to Mr. Facenda's Lanham Act claim.[46]

Applying their erroneous interpretation of <u>Rogers,</u> Defendants cite to <u>Seale v. Gramercy Pictures</u>, 949 F. Supp. 331 (E.D. Pa. 1997), a case which concerned a motion picture biography of Black Panther Bobby Seale.  Defendants argue that the "use" of Bobby Seale's image in a movie about his life is somehow legally relevant and applicable to the "use" of Mr. Facenda's voice in a commercial.   The distinctions between the movie in <u>Seale</u> (which used Seale's likeness in an artistic movie about his life- not in a commercial about a product unrelated to him) and the commercial at issue here (which employed Mr. Facenda's voice to attract attention to a video game unrelated to Mr. Facenda) are underscored by language employed by the Court.

---

[46] By so distorting the holding in <u>Rogers</u>, the defendants have been able to advance two completely contradictory arguments in two different sections of their brief.  In the section devoted to misinterpreting Rogers, the defense argues that the "use" of Facenda's voice was "artistically relevant" to the commercial and that it "augment(ed) the connection between the authenticity of the Madden NFL 06 videogame and NFL football", one of "the central themes of the entire program".  Defendants' brief at 13.  Four pages later, (in connection with their "incidental use" argument) the Defendants take an entirely contrary approach and assert that Mr. Facenda's voice was "insignificant to the commercial purpose of NFL Films having created The Making Of Madden NFL 06." Id. at page 18.

> ...(U)se of a person's name and likeness in news, entertainment, and creative works does not infringe on the right of publicity. . . . However, if the name or likeness is used solely to attract attention to a work that is not related to the identified person, the user may be subject to liability

949 F. Supp at 336 (emphasis added).  In fact, while the Court held that Seale could not assert a Lanham Act claim with respect to the artistic motion picture which told his life's story, he could, in fact, maintain a Lanham Act claim arising out of the use of his name and photograph in connection with a CD of music that was unrelated to his biography.  In this respect, the case, cited by the defendants, articulates the differences between protected artistic expression and unprotected advertising.

> (T)he Plaintiff has raised a genuine issue of material fact showing that the Defendants' use of the Plaintiff's name and likeness on the cover of the musical CD/cassette constitutes a violation of the Lanham Act for unfair competition and false advertising.....There is a genuine issue of material fact, therefore, whether the use of the Plaintiff's name and likeness on the cover of the musical CD/cassette ... is a disguised advertisement for the sale of the CD/cassette.

Id. at 340.  It is in this respect that defendants' citation to Seale is so curious.  The defendants did not use Facenda's voice in a documentary about Facenda; they used it as part of an advertisement for the sale of a videogame.  Moreover, Seale stands for the proposition that the use of a person's image (or, in Mr. Facenda's case, a person's voice) on a commercial product can constitute an "endorsement" of the product.  Id.  Accordingly, the First Amendment does not preclude the imposition of liability under both the Lanham Act and Right of Publicity claims.  Id.[47].

---

[47] Defendants entire challenge to the Lanham Act claim is predicated exclusively upon the specious assertion that the commercial is a documentary "entitled to the full protection of the First Amendment", the Court can readily dispose of this challenge simply by finding that the program was, indeed, a commercial (or by concluding that a factual question exists as to the nature of the program).

### B.      Mr. Facenda's State Law Claims Are Not Preempted

#### 1.      Defendants Argue For Preemption Without Conceding That The Recordings Of Mr. Facenda's Voice Are Copyrightable

Defendants' next argument is their most calculated.  Without once acknowledging that Mr. Facenda had a copyrightable interest in his vocal performances[48], Defendants argue that Mr. Facenda's  state law claims are preempted by operation of the Copyright Act. 17 U.S.C. §301[49].

Section 301 of the Copyright Act establishes a two-part test for preemption. First, the work and all work supporting it "must come within the 'subject matter of copyright' as defined in Sections 102 and 103 of the Copyright Act. Second, the rights granted under state law must be 'equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106 [of the Copyright Act].'" Del Madera Properties v. Rhodes & Gardner, Inc., 820 F.2d 973, 976 (9th Cir. 1987), citing, Harper & Row, Publishers, Inc. v. Nation Enterprises, 501 F.

---

[48] Irrespective of whether Mr. Facenda possesses a copyrightable interest in his vocal performances with NFL Films, it is clear that he never obtained a copyright registration.

[49] Section 301 of the Copyright Act, provides in pertinent part:

> (a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.
> (b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to --
> (1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or
> (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

17 U.S.C. § 301 (emphasis added).

Supp. 848, 850 (S.D.N.Y. 1980), aff'd, 723 F.2d 195 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985).

The first prong sets forth the primary inquiry: if the work in question does not fall within the general scope of copyrightable subject matter, state law may protect it. It is in this respect that Defendants are playing an interesting game, for nowhere in their Brief do they concede that Mr. Facenda had a copyrightable interest in the recordings at issue. Defendants tap dance around this issue because they cannot go on record and affirmatively declare that Mr. Facenda had a copyrightable interest in his narrative performances; to do so would leave them defenseless in the event that Mr. Facenda's estate seeks to claim that right. Thus, defendants are arguing for preemption without even alleging that Mr. Facenda's work "is within the subject matter of copyright law".

If Defendants are claiming that Mr. Facenda had no copyrightable interest in his narrative performances, his right to control the use of his voice would implicate the construction of the "release"[50], not questions of copyright law. In such a case, his claims would not be subject to pre-emption. The exclusive rights conferred by copyright law are distinct from those rights bargained for by two contracting parties. ProCD, Inc. v Zeidenberg, 86 F.3rd 1447, 1454 (7th Cir. 1996) ("A copyright is a right against the world….Contracts, by contrast generally affect only their parties…so contracts do not create 'exclusive rights'").

If, on the other hand, Defendants concede that Mr. Facenda does, indeed, have a copyrightable interest, the second prong of the preemption test will remain unsatisfied. Toney v.

---

[50] Defendants could conceivably argue that Mr. Facenda was extended such a right as an inducement for his continued service to NFL Films.

L'Oreal, 406 F.3rd 905 (7th Cir. 2004) (right of publicity case not preempted because it implicates interests other than those set forth in the Copyright Act).[51]

Defendants recognize that "not all right of publicity cases are preempted by the Copyright Act,"[52] but assert (in a very carefully worded sentence) that "in every instance in which a right of publicity claim has been based on the use of a vocal or acting performance, courts uniformly have held that both prongs of the preemption analysis are satisfied." Defendants' Brief at 15. In support of this unwarranted overstatement, Defendants cite to two cases which are purportedly "on point". One case, Laws v Sony Music Entm't, 448 F3d 1134 (9th Cir 2006), is described by Defendants as "directly on point." Laws concerned a professional singer who *contracted away* her rights to her recorded vocal performances and subsequently brought a "right of publicity" claim when a portion of one of her songs was incorporated into a hit record by another artist. The Court rejected all of her claims

> The essence of Laws's claim is, simply, that she objects to having a sample of "Very Special" used in the Jennifer Lopez-L.L. Cool J recording. But Laws gave up the right to reproduce her voice--at least insofar as it is incorporated in a recording of "Very Special" --when she contracted with Elektra in 1981 and acknowledged that Elektra held the "sole and exclusive right to copyright such master recordings.

Id. at page 1144.

Oddly, although defendants maintain that this case is directly on point, there is one glaring distinction between it and the case at bar. In Laws, the plaintiff *contracted away* all of her rights. In the current case, NFL Films, the purported copyright holder, contracted away its

---

[51] See also, Shamsky v. Garan, Inc., 167 Misc. 2d 149, 156, 632 N.Y.S. 2d 930, 934 (1995)(where 1969 New York Mets players contractually retained the right to use their likenesses for commercial purposes and could therefore maintain a "right to privacy" claim.("The players are not seeking to assert a right in the picture; they are seeking to assert a right to the commercial exploitation of their identities").
[52] Defendants' brief at 15.

rights and/or Mr. Facenda contractually retained his.  This is not merely an academic distinction. In <u>Toney v L'Oreal</u>, 406 F.3rd 905 (7th Cir. 2004), the plaintiff did what John Facenda had done: she retained control over the uses to which her copyrighted photograph would be put (by contract, she limited the copyright holder's right to use the photograph to a five year period between 1995 and 2000; Toney's temporal limitation is akin to Mr. Facenda's substantive restrictions).  The defendants in Toney used the photograph beyond 2000, in contravention of the agreement (not unlike NFL Films, which used Mr. Facenda's voice in contravention of the no-endorsement restriction).

The Seventh Circuit held that Toney's Right of Publicity claims were not preempted. Although *the photograph* was deemed to be subject to copyright, <u>Ms. Toney's identity was not</u>. "A person's likeness--her persona--is not authored and it is not fixed. <u>The fact that an image of the person might be fixed in a copyrightable photograph does not change this</u>." 406 F. 3rd at 910. By using the photograph when they had no right to do so, the defendants in <u>Toney</u> also used the plaintiff's identity (her persona).  The Court reasoned that "Copyright laws do not reach identity claims such as Toney's.  Identity… is an amorphous concept that is not protected by copyright law; thus, the state law protecting it is not preempted". <u>Id.</u>

The Court also noted that the purpose of the Illinois Right Of Publicity Act (like Pennsylvania's) "is to allow a person to control <u>the commercial value</u> of his or her identity.[53] Unlike copyright law, 'commercial purpose' is an element required by the IRPA." Id.  Using language that would apply equally to Mr. Facenda's claim, the Seventh Circuit held

---

[53] 406 F. 3rd at 910.  The Pennsylvania statute governing the Unauthorized Use of Name or Likeness applies to "Any natural person whose name or likeness has commercial value and is used for any commercial or advertising purpose..." 42 Pa.C.S.§8316

> Clearly the defendants used Toney's likeness with-out her consent for their commercial advantage. The fact that the photograph itself could be copyrighted, and that defendants owned the copyright to the photograph that was used, is irrelevant to the IRPA claim. The basis of a right of publicity claim concerns the message--whether the plaintiff endorses, or appears to endorse the product in question.  One can imagine many scenarios where the use of a photograph without consent, in apparent endorsement of any number of products, could cause great harm to the person photographed. The fact that Toney consented to the use of her photograph originally does not change this analysis. The defendants did not have her consent to continue to use the photograph, and therefore, they stripped Toney of her right to control the commercial value of her identity.

Id.

Even more telling is the fact that the Court in Laws (the case which defendants claimed was directly on point) held that the result in that case might have been different had Laws sued the parties with whom she had originally contracted, as Mr. Facenda has done here.  The Laws Court held as follows:

> Toney differs from this case in a significant way: Toney brought her right of publicity claim against L'Oreal U.S.A., Inc., the Wella Corp., and Wella Personal Care of North America, Inc., which each at some point held the copyright and had agreed not to use Toney's likeness after 2000. The facts of this case would be analogous to Toney if Laws had brought her right of publicity claim against Elektra, which holds the copyright to the song and may have agreed to licensing limitations…

 Laws v Sony Music Entm't, supra, 448 F3d  at 1142 n.4 .

In fact, Baltimore Orioles Inc. v Major League Baseball Players Ass'n, 805 F.2d 66 (7th Cir. 1986) the other case cited by the defendants as being "on point" is, politely speaking, wide of the mark.  First of all, Baltimore Orioles simply held that major league baseball players had no right to their televised baseball performances because they were employees of the copyright owners.  Unlike the players whose television performances were "works made for hire", Mr.

Facenda was an independent contractor.  In fact the case specifically recognizes that the result would be different had the players' likenesses been used in a commercial, not a baseball telecast.

> [a] player's right of publicity in his name or likeness would not
> be preempted if a company, without the consent of the player,
> used the player's name to advertise its product.

805 F.2d at 666 n.24.

### C.    Defendants' Use Of Facenda's Voice Was Not Incidental

Defendants' remaining arguments are among their most specious.  Defendants claim that Facenda's voice was only incidentally and insignificantly used in the commercial, a contention that, on its face, is at odds with their earlier assertion that Facenda's voice "augment(ed) the connection between the authenticity of the Madden NFL 06 videogame. Defendants' brief at 13.

Again, Defendants' "analysis" is undermined by the cases to which they cite.  They point to Aligo v. Time Life Books, 23 Media L. Rep. 1315, No. C94-20707JW, 1994 WL 715605 (N.D. Cal. Dec. 19, 1994) in which a "29 minute infomercial that briefly[54] showed plaintiff featured on a magazine cover" was  deemed to be "incidental" and not actionable.  Yet, the case actually stands for the proposition that "incidental use" is one in which there is no "connection between the use and the commercial purpose".  Contrary to defendants' misleading argument, "incidental use" is not determined by the duration of the use.  Pooley v. National Hole In One Ass'n, 89 F. Supp. 1108 (D. Az. 2000) (use of six seconds of film footage of plaintiff was not "incidental" where it was "integral to the defendant's advertising and clearly enhanced the marketability of defendant's service")

---

[54] Briefly, as in four seconds.

27

It is in this respect that Defendants cannot stop tripping over their inconsistent arguments. On page 18 of their brief (in the section addressing incidental use) they declare that "the three sentences read by Mr. Facenda...are insignificant to the commercial purpose of...The Making Of Madden NFL 06", but on page 13 they claim that "the use of those three sentences has obvious artistic relevance to the program".   On page 19, they assert that there was no direct connection between the use of Facenda's voice and the commercial purpose of the infomercial; on page 13, however, they admit that Mr. Facenda's voice "augment(ed) the connection between the authenticity of the Madden NFL 06 videogame and NFL football", and that "authenticity" was one of "the central themes of the entire program".  Indeed, the "13 seconds" of Mr. Facenda's voice are not buried within the program; they are prominently used in the commercial's opening 45 second *title sequence* (the equivalent of a newspaper headline) within the first two minutes of the broadcast.  The suggestion that this use was "incidental" or "insignificant" is, on its face, simply another one of Defendants' tortured, disingenuous arguments.

### D.   The Commercial Is Not A "News Presentation" On A Matter Of Public Interest

Defendants final argument is both procedurally improper and substantively without merit. They assert that their commercial concerned "a news presentation having public interest" and is thus exempt from the Pennsylvania statute that prohibits the unauthorized use of a name or likeness.  42 Pa.C.S. 8316.

The statute's use of the phrase "news presentation" is not accidental.  On its face, the statute exempts those instances in which a person appears in a newspaper or on the evening news in connection with a story of interest to the public.  Defendants' characterization of the commercial as a "news presentation" is, on its face, ludicrous, and, again, underscores the

significance of their appalling failure to apprise the Court of their commercial partnership with Electronic Arts.

Moreover, in their effort to convince the Court that the release of the Madden game was a matter of public interest (we can only assume that they would likewise argue that the release of the next installments of "Super Mario Brothers", "Crash Bandicoot" and other video games will be accorded similar exalted status), Defendants stray far from the pleadings and impermissibly rely upon the *substance* of newspaper accounts.  <u>Benak v. Alliance Capital Mgmt.</u>, 435 F.3d 396, 401 n.15 (3d Cir. 2006)[55].

At best, Defendants' specious argument raises a factual question unsuitable for resolution in the context of a Motion For Judgment On The Pleadings.

---

[55] See footnote one.

**III.**     **CONCLUSION**

Plaintiff has properly asserted a claim so as to control the commercial uses to which John Facenda's voice can be put.  Defendants' Motion, on the other hand, is predicated upon mis-statements of fact, distortions of precedent, omissions of material fact and procedural improprieties.  Accordingly, Plaintiff respectfully requests that this Court enter an Order denying Defendants' Motion.

**THE BEASLEY FIRM, LLC**

By:     _____
         Paul A. Lauricella, Esquire
         Attorney I.D. No.:  45768
         1125 Walnut Street
         Philadelphia, PA  19107
         (215) 592-1000
         Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

Paul A. Lauricella hereby certify that a true and correct copy of the within Response to Defendants' Motion for Judgment on the Pleadings was served by Hand Delivery and UPS - Overnight this 8th day of September, 2006 on the following:

Robert Spinelli, Esquire
Catherine Jasons, Esquire
**Kelly, Jasons, McGowan, Spinelli & Hanna, LLP**
Centre Square West, Suite 1500
1500 Market Street
Philadelphia, PA  19102
**via Hand Delivery**

Bruce P. Keller, Esquire
**Debevoise & Plimpton**
919 Third Ave
New York, Ny 10022
**via UPS**

_____
Paul A. Lauricella